FILED

2022 Jan-14  PM 04:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# EASTERN DIVISION

HOLLIS BARRY HIGHFIELD,                    )
                                           )
        Plaintiff,                         )
                                           )
v.                                         )        Case No.  1:19-cv-02002-KOB-JHE
                                           )
SHERIFF GREENE, et al.,                    )
                                           )
        Defendants.                        )

## REPORT AND RECOMMENDATION

Plaintiff Hollis Barry Highfield filed a *pro se* amended complaint pursuant to 42 U.S.C. §

1983, alleging violations of his rights under the Constitution or laws of the United States.  (Docs.

12 & 13).  Highfield names the following defendants in the amended complaint: Cleburne County

Sheriff Dennis Green, Jail Administrator Lane Kilgore, Dr. Jerry Gurley, and Nurse Traci Screws.[1]

(Doc. 12 at 2–3).   Highfield seeks monetary and injunctive relief.  (Doc. 12 at 5).

In accordance with the usual practices of this court and 28 U.S.C. § 636(b)(1), the court

referred the amended complaint to the undersigned magistrate judge for a preliminary report and

recommendation. *See McCarthy v. Bronson*, 500 U.S. 136 (1991).  As explained below, the

undersigned recommends the court grant the defendants' motions for summary judgment and

dismiss this action with prejudice.

## I. PROCEDURAL HISTORY

On October 5, 2020, the undersigned entered an Order for Special Report directing the

Clerk to forward copies of the amended complaint to each of the named defendants and directing

the defendants to file a Special Report addressing Highfield's factual allegations.  (Doc. 14).  The

---

[1] Green and Screws were incorrectly identified as "Sheriff Greene" and "Nurse Tracy" in the
amended complaint.  (Doc. 12 at 1–3).

undersigned advised the defendants that the Special Report could be submitted under oath or accompanied by affidavits and, if appropriate, the undersigned would consider it as a motion for summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Doc. 14).

On January 14, 2021, Dr. Gurley filed a Special Report, accompanied by a sworn declaration and exhibits.  (Doc. 39).  On March 4, 2021, Green and Kilgore filed a Special Report, supplemented by sworn declarations and exhibits.[2]  (Docs. 42 & 43).  On June 15, 2021, Screws filed a Special Report, accompanied by a sworn declaration and exhibits.  (Doc. 49).

The undersigned notified the parties that the Special Reports would be construed as motions for summary judgment and notified Highfield that he had 21 days to respond to the motions for summary judgment by filing affidavits or other material.  (Doc. 50).  The undersigned also advised Highfield of the consequences of any default or failure to comply with Fed. R. Civ. P. 56.  (Doc. 50).  *See Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985).

On August 31, 2021, counsel appeared on Highfield's behalf and filed a response.  (Docs. 51 & 52).  This matter is now before the undersigned on the defendants' motions for summary judgment and the response thereto.

## II. STANDARD OF REVIEW

Because the court has construed the defendants' Special Reports as motions for summary judgment, Fed. R. Civ. P. 56 governs the resolution of the motions.  Under Rule 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all

---

[2] Green and Kilgore were unavailable to sign the declarations attached to their Special Report (doc. 42 at 2 n.1); however, they supplemented the Special Report with their signed declarations shortly thereafter.  (Docs. 43 & 44).

reasonable inferences against the moving party. *Chapman v. AI Transport,* 229 F.3d 1012, 1023 (11th Cir. 2000). The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues of material fact and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc*., 929 F.2d 604, 608 (11th Cir. 1991). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial, and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Bennett v. Parker*, 898 F.2d 1530, 1532-33 (11th Cir. 1990). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." [citations omitted]. Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

*Bennett*, 898 F.2d at 1532.

However, any "specific facts" pled in a *pro se* plaintiff's sworn complaint must be considered in opposition to summary judgment. *See Caldwell v. Warden, FCI Talladega,* 748 F.3d 1090, 1098 (11th Cir. 2014) (citing *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986)). A court must construe a *pro se* complaint more liberally than it would pleadings drafted by lawyers. *Hughes v. Rowe*, 449 U.S. 5, 9 (1980). A *pro se* pleading "is held to a less stringent standard than a pleading drafted by an attorney" and is liberally construed. *Jones v. Fla. Parole Comm'n*, 787 F.3d 1105, 1107 (11th Cir. 2015). Because Highfield was proceeding *pro se* when he filed the amended complaint (docs. 12 & 13), the undersigned will construe it liberally. *See Hughes*, 449 U.S. at 9.

3

### III. SUMMARY JUDGMENT FACTS[3]

Highfield was incarcerated at the Cleburne County Jail from November 15, 2017 to May 22, 2019.[4]  (Doc. 13 at 7, Highfield Aff.; Doc. 49-1, Screws Decl. ¶ 47).  Upon booking, Highfield notified jail medical staff that he suffered from arthritis and chronic obstructive pulmonary disease ("COPD") and was prescribed Advair, Incruse, and Ventolin.  (Doc. 39-2 at 4, 9).

Quality Correctional Health Care ("QCHC") provides a licensed physician who comes to the Cleburne County Jail at least once a week to examine and treat inmates.  (Doc. 43-2, Kilgore Decl. ¶ 15).  QCHC also provides a licensed practical nurse ("LPN") to provide healthcare assessments of inmates and to package inmate medications.  (Doc. 43-2, Kilgore Decl. ¶ 15).  An LPN comes to the jail at least two days a week to assess inmates' medical needs. (Doc. 43-2, Kilgore Decl. ¶ 15).  An LPN and corrections officers pass out medications to inmates.  (Doc. 43-2, Kilgore Decl. ¶ 15).  All medications are distributed according to the medical provider's instructions.  (Doc. 43-2, Kilgore Decl. ¶ 15).  When a medical provider is not at the jail, one is always on call and available to corrections officers.  (Doc. 43-2, Kilgore Decl. ¶ 15).

QCHC sick call request forms are used by inmates to request medical care.  (Doc. 43-2, Kilgore Decl. ¶ 11).  QCHC staff collects sick call request forms at pill call.  (Doc. 43-2, Kilgore Decl. ¶ 11).  If an inmate gives a medical form to a corrections officer, the officer should pass it to QCHC staff.  (Doc. 43-2, Kilgore Decl. ¶ 11).  An inmate in need of any type of medical attention

---

[3]   Based on the foregoing summary judgment standard, the following facts are undisputed or, if disputed, taken in a light most favorable to the non-moving party.  Factual disputes are addressed in footnote form.

[4] Highfield contends he was transferred to state custody on April 12, 2019, (doc. 13 at 7, Highfield Aff.), but medical records indicate he was still under the care of medical staff at Cleburne County Jail after April 12, 2019.  (Doc. 49-2 at 11, 20, 24).

that is not an emergency may complete a QCHC sick call request form.  (Doc. 43-2, Kilgore Decl. ¶ 14).

Highfield's family brought his previously prescribed COPD medications to him at the jail. (Doc. 13 at 7, Highfield Aff).  Highland contends that as long as his family purchased the medications and brought them to the jail, medical staff would allow him to have them.  (Doc. 13 at 7, Highfield Aff.).  However, on the occasions when his family could not bring the medications to the jail, he went without them until Dr. Gurley prescribed him an inhaler called Qvar, which was not as effective.  (Doc. 13 at 4; Doc. 13 at 7, Highfield Aff).  Dr. Gurley informed Highfield that the medications he had been prescribed previously were too costly and Dr. Gurley "could only prescribe what he could get through FEMA."  (Doc. 13 at 7, Highfield Aff.).  Dr. Gurley told Highfield that he would have to use Qvar unless his family could purchase his previously prescribed medications.  (Doc. 13 at 7, Highfield Aff.).

During Highfield's incarceration, an unknown nurse allowed him to run out of his Qvar and Albuterol inhalers on three different occasions for up to two weeks.  (Doc. 13 at 7, Highfield Aff.).  Highfield notified Kilgore and Screws that he was out of his medications and "left to suffer" until he eventually received the medications.  (Doc. 13 at 7–8, Highfield Aff.).  On one occasion, his lungs began to hurt, and he started "coughing up yellowish colored mucus," which he showed Screws.  (Doc. 13 at 8, Highfield Aff.).  Screws informed Highfield that according to the finger monitor, he was getting enough oxygen.  (Doc. 13 at 8, Highfield Aff.).

On February 15, 2018, Highfield wrote a letter to Kilgore wherein he complained that "the nurse and doctor [can't] or [won't] go any further to treat [his] lungs."  (Doc. 13 at 13).  Highfield complained that it took his personal physician a year to determine the appropriate treatment for him, but jail medical staff replaced his medications "with something that just gets [him] by" and

was "hardly working." (Doc. 13 at 13). Highfield stated that he knew his previously prescribed medications were expensive, and the reason why jail medical staff did not prescribe them to him. (Doc. 13 at 13). Highfield asserted that his lungs hurt and when he informed the nurse and doctor, they responded that the medications they prescribed were "all they [could] get." (Doc. 13 at 13).

On April 12, 2018, Highfield wrote a letter to Kilgore informing him that he was out of Advair and Incruse, and his emergency inhaler was insufficient. (Doc. 13 at 12). Highfield stated that he needed the medications, and his lungs were hurting, and he was coughing. (Doc. 13 at 12). At the bottom of the letter is the sentence, "I forwarded your letter to medical." (Doc. 13 at 12). The response is not signed. (Doc. 13 at 12).

On an unknown date, Kilgore informed Highfield that neither he nor Green could order medications or medical procedures for him. (Doc. 13 at 11). Kilgore explained that he and Green deferred all medical questions to trained medical staff. (Doc. 13 at 11). However, Kilgore assured Highfield that he would discuss his concerns with medical staff "but all medical decisions rest with the QCHC staff."[5] (Doc. 13 at 11).

On April 16, 2018, Dr. Gurley prescribed Highfield Incuse and Advair for 30 days. (Doc. 39-2 at 16). On the same day, medical staff contacted an outside pharmacy previously used by Highfield. (Doc. 39-2 at 48). An employee at the pharmacy stated that Highfield's prescriptions would be filled and mailed to the facility. (Doc. 39-2 at 48).

---

[5] Kilgore states that any written grievance or communication Highfield made about medical care, including wanting a different medication or wanting to see a medical professional, would have been forwarded to medical staff. (Doc. 43-2, Kilgore Decl. ¶ 10). Kilgore asserts he has never denied Highfield access to medical care and at no time did he fail to respond to or deliver a medical request from Highfield to medical staff. (Doc. 43-2, Kilgore Decl. ¶ 16). Kilgore contends he relies upon the professional opinions of the doctor and nurses who treat inmates at the jail, and he has not seen or heard anything that would indicate the medical services provided have been unsatisfactory. (Doc. 43-2, Kilgore Decl. ¶ 23).

On May 3, 2018, Highfield cut his wrist with a razor so he could be transported to the hospital because of pain in his lungs and "the lack of air." (Doc. 13 at 8, Highfield Aff.; Doc. 39-3 at 16).   Once at the hospital, he informed a doctor about his COPD and inability to breathe. (Doc. 13 at 8, Highfield Aff.).  Apart from treatment for the laceration on his arm, hospital records indicate that Highfield was diagnosed with acute bronchitis (doc. 39-3 at 17), and hospital staff performed an x-ray of Highfield's chest.  (Doc. 39-3 at 25).  Highfield claims a physician informed him that the x-ray revealed he had a "bad case of this C.O.P.D. condition" that had progressed because he had not been "properly treated with the medications that were originally prescribed to [him]."[6]  (Doc. 13 at 8–9, Highfield Aff.).  Highfield was discharged on May 4, 2018.  (Doc. 39-3 at 24).

On May 8, 2018, Screws examined Highfield's wound and obtained his vital signs, which were within acceptable limits, including his oxygen saturation.  (Doc. 49-1, Screws. Decl. ¶ 22; Doc. 49-2 at 47).  Screws cleaned Highfield's wound with soap and water and placed him on suicide watch as Dr. Gurley instructed.  (Doc. 49-1, Screws. Decl. ¶¶ 24–25; Doc. 49-2 at 47).

On May 10, 2018, Dr. Gurley saw Highfield who reported a history of depression but acknowledged that he had not taken medication in the past for it.  (Doc. 39-1, Gurley Decl. ¶ 14; Doc. 39-2 at 50).  Highfield denied suicidal or homicidal ideations and denied auditory and visual hallucinations.  (Doc. 39-1, Gurley Decl. ¶ 15; Doc. 39-2 at 50).  Based on Dr. Gurley's

---

[6] Highfield's hospital records do not indicate this.  (Doc. 39-3 at 25).  Rather, the chest x-ray performed at the hospital showed Highfield's lungs were clear, with no mass or consolidation, and no pneumothorax or pleural effusion.  (Doc. 39-3 at 25).  Additionally, the cardiomediastinal silhouette was unremarkable.  (Doc. 39-3 at 25).  The radiologist noted no acute chest findings. (Doc. 39-3 at 25).

assessment, he discontinued Highfield from suicide watch.  (Doc. 39-1, Gurley Decl. ¶ 16; Doc. 39-2 at 50).

On June 13, 2018, Dr. Gurley prescribed Highfield Incruse, Advair, and Albuterol inhalers for 30 days.[7]  (Doc. 39-2 at 16).

On June 21, 2018, Dr. Gurley examined Highfield for complaints of a productive cough. (Doc. 39-1, Gurley Decl. ¶ 18; Doc. 39-3 at 2).  Dr. Gurley did not find any evidence of infection, and noted Highfield's lungs were clear, and he had no dyspnea, wheezing, or shortness of breath. (Doc. 39-1, Gurley Decl. ¶ 19; Doc. 39-3 at 2). Dr. Gurley also noted Highfield's oxygen saturation was 99 percent, which he contends is a normal reading.  (Doc. 39-1, Gurley Decl. ¶ 20; Doc. 39-3 at 2).  Dr. Gurley's assessment was that Highfield was suffering from COPD and bipolar disease. (Doc. 39-1, Gurley Decl. ¶ 21; Doc. 39-3 at 2).   Dr. Gurley prescribed Highfield Qvar and Albuterol inhalers for 30 days, and ordered a chest x-ray, complete blood count, and comprehensive metabolic panel.  (Doc. 39-1, Gurley Decl. ¶ 22; Doc. 39-3 at 2).  Dr. Gurley also prescribed Highfield Haldol for 30 days with a plan to follow-up in three to four weeks.  (Doc. 39-1, Gurley Decl. ¶ 23; Doc. 39-3 at 2).

On June 25, 2018, Highfield underwent a chest x-ray which revealed no significant consolidation, masses, effusions, or pneumothorax in his lungs.  (Doc. 39-3 at 40).  Additionally, Highfield's osseous structures showed no acute abnormality.  (Doc. 39-3 at 40).  The radiologist concluded the x-ray showed no acute cardiopulmonary disease.  (Doc. 39-3 at 40).

---

[7] Highfield's medical records reflect that Dr. Gurley twice prescribed Highfield Advair and Incruse.  (Doc. 39-2 at 16).  Taking as true Highfield's assertion that as long as his family purchased his medications, including Advair, he could have them, and given the note in his medical records which indicates that on at least one occasion, an outside pharmacy filled his medications and agreed to mail them to the jail (doc. 39-2 at 48), the undersigned assumes medical staff prescribed Highfield Advair and Incruse to the extent his family purchased the medications.

On Sunday, July 8, 2018, Highfield was involved in a physical altercation with another inmate.  (Doc. 42-1 at 7).  Prison staff noted that Highfield had been extremely agitated since Friday evening because he did not receive his evening inhaler.  (Doc. 42-1 at 7).  Prison staff spoke with Screws Friday night and Screws determined that she would address the issue the following Tuesday.  (Doc. 42-1 at 7).  Highfield demanded his morning inhaler, but Screws refused.  (Doc. 42-1 at 7).  On Saturday, Highfield argued with prison staff about his evening medications, and prison staff repeated Screws' instructions.  (Doc. 42-1 at 7).  After Highfield's altercation on Sunday, prison staff spoke with Screws and informed Highfield that Screws' decision on the medication remained the same.  (Doc. 42-1 at 7).  Highfield claimed he needed his rescue inhaler, but Screws directed prison staff to check Highfield's oxygen level which was 98 percent.  (Doc. 42-1 at 7).

 On July 12, 2018, Highfield submitted an inmate request to see Dr. Gurley to determine which medication was upsetting his stomach, and to get his medications restarted.  (Doc. 39-2 at 45).   On the same day, Dr. Gurley saw Highfield for a follow-up examination.  (Doc. 39-3 at 11). Highfield informed Dr. Gurley that his family was no longer able to provide his Incruse inhaler. (Doc. 39-3 at 11).  Dr. Gurley noted that Highfield was already on medications for COPD.  (Doc. 39-3 at 11).  Dr. Gurley also noted that Highfield had been found hoarding other medications and discontinued his prescriptions for Haldol, Cogentin, and Incruse.  (Doc. 39-3 at 11; Doc. 39-2 at 15).

On August 16, 2018, Dr. Gurley renewed Highfield's prescription for Qvar and Albuterol for 90 days.  (Doc. 39-2 at 14).

On August 23, 2018, Screws evaluated Highfield during Chronic Care Clinic for his COPD and mental health conditions.  (Doc. 39-1, Gurley Decl. ¶ 27; Doc. 39-3 at 7–10).  On August 27,

2018, Dr. Gurley examined Highfield and noted that his chest was clear with no wheezing present. (Doc. 39-1, Gurley Decl. ¶¶ 27–28; Doc. 39-3 at 12).  Dr. Gurley restarted Highfield's mental health medications and educated him on using his inhalers as ordered for his COPD.  (Doc. 39-1, Gurley Decl. ¶ 29; Doc. 39-3 at 12).  On August 30, 2018, Dr. Gurley prescribed Highfield Cogentin and Haldol for 30 days.  (Doc. 39-2 at 14).

On September 2, 2018, Highfield submitted a sick call request wherein he complained of arthritis and that his lungs felt as if he was "breathing through cotton."  (Doc. 39-2 at 38).  On September 6, 2018, Screws noted Highfield had no signs or symptoms of respiratory distress and his skin and lips were pink.  (Doc. 39-2 at 38).  Screws also noted Highfield was "continuously arguing with medical staff."  (Doc. 39-2 at 38; Doc. 49-1, Screws Decl. ¶ 28).

Due to Highfield's complaints, Kilgore observed Highfield on November 9, 2018, as Dr. Gurley and a nurse provided Highfield medical care.  (Doc. 43-2, Kilgore Decl. ¶ 10).  Kilgore communicated with Green and kept him informed about Highfield's complaints and medical care. (Doc. 43-2, Kilgore Decl. ¶ 10).

On January 1, 2019, Highfield submitted a sick call request wherein he complained of cold symptoms affecting his lungs and he was coughing up blood.  (Doc. 49-2 at 29).  On January 3, 2019, Dr. Gurley renewed Highfield's prescription for Qvar.  (Doc. 39-2 at 12).

On January 5, 2019, Screws evaluated Highfield for his complaints of cold symptoms and obtained his vitals, which were within acceptable limits.  (Doc. 49-2 at 28; Doc. 49-1, Screws Decl. ¶ 37).  Screws noted that Highfield's lungs were clear and his anterior cervical lymph nodes were not swollen or tender.  (Doc. 49-2 at 28; Doc. 49-1, Screws Decl. ¶ 39).  Screws administered ibuprofen and Chlor-Trimeton to Highfield to alleviate his cold symptoms.  (Doc. 49-2 at 28; Doc. 49-1, Screws Decl. ¶ 40).

On February 17, 2019, Highfield submitted an inmate sick call request wherein he complained of shoulder pain and pain in his lungs.  (Doc. 49-2 at 26).  On February 19, 2019, Screws noted that Highfield's lungs were clear with good air flow and oxygen saturation.  (Doc. 49-2 at 26; Doc. 49-1, Screws Decl. ¶¶ 41–43).  However, Highfield was uncooperative with a peak flow test.  (Doc. 49-1, Screws Decl. ¶ 43; Doc. 49-2 at 26).

On February 21, 2019, Dr. Gurley examined Highfield and noted his lungs were clear with no wheezing or rhonchi.  (Doc. 39-3 at 15).  Additionally, Highfield's breathing was unlabored, and his oxygen saturation was greater than 98 percent.  (Doc. 39-3 at 15).  Dr. Gurley also noted Highfield spoke without difficulty and did not have labored breathing.  (Doc. 39-3 at 15).  However, Dr. Gurley ordered that Highfield receive an x-ray of his chest.  (Doc. 39-3 at 15).

On the same day, Highfield underwent a chest x-ray which showed his lungs were without infiltrate, atelectasis, or effusion.  (Doc. 39-3 at 5).  The x-ray further indicated no pulmonary vascular congestion or edema; the mediastinal contours were within normal limits; the remaining osseous structures and soft tissues were unremarkable; and the appearance had not changed from the comparison exam.  (Doc. 39-3 at 5).  The radiologist concluded the x-ray did not indicate acute cardiopulmonary disease.  (Doc. 39-3 at 5).

Dr. Gurley renewed Highfield's prescription for Qvar on April 25, 2019.  (Doc. 39-2 at 11). Highfield was transferred to state custody on May 22, 2019.[8]  (Doc. 49-1, Screws Decl. ¶ 47).

Highfield contends he was in pain from February 15, 2018 to August or September 2018.  (Doc. 13 at 8, Highfield Aff.).  He asserts his "lungs would be in better shape" if he had been

---

[8] While housed at Cleburne County Jail, Highfield complained of and medical staff treated him for other conditions unrelated to his complaints in this action.  (Doc. 39-1, Gurley Decl. ¶¶ 32–41, 43–46; Doc. 39-2; Doc. 39-3).

provided the proper medications at Cleburne County Jail.   (Doc. 13 at 10, Highfield Aff.).

Highfield alleges Green failed to provide adequate funds to cover the costs of his previously

prescribed medications.[9]   (Doc. 13 at 9, Highfield Aff.).

## IV. ANALYSIS

Highfield alleges the defendants were deliberately indifferent to his serious medical needs

in violation of the Eighth Amendment by denying him access to certain medications for his COPD

during his incarceration at the Cleburne County Jail.[10]   (Docs. 12 & 13).   The defendants' motions

for summary judgment are due to be granted on Highfield's Eighth Amendment claims.

The United States Supreme Court has held that it is only deliberate indifference to serious

medical needs which is actionable under 42 U.S.C. § 1983.   *See Estelle v. Gamble*, 429 U.S. 97,

104 (1976).   A plaintiff must present evidence showing that he had a serious medical need, that

the defendant acted with deliberate indifference in responding or failing to respond to that need,

and that the defendant's wrongful actions caused an injury.   *See Goebert v. Lee Cty*., 510 F.3d

1312, 1326 (11th Cir. 2007). The conduct of prison officials must run counter to evolving standards

---

[9] Green and Kilgore contend they did not communicate to any QCHC employee to make medical decisions based upon the cost of medical treatment and to their knowledge, Highfield was not denied any medically necessary medication or treatment due to cost.   (Doc. 43-1, Green Decl. ¶ 17; Doc. 43-2, Kilgore Decl. ¶ 18).   Green asserts he never denied Highfield any medication and was not involved in decisions involving Highfield's medical care.   (Doc. 43-1, Green Decl. ¶ 19).

[10] It is unclear whether Highfield was a pre-trial detainee or convicted prisoner when the allegations in his amended complaint occurred.   If Highfield was a pre-trial detainee, the Due Process Clause of the Fourteenth Amendment governs his claims, not the Eighth Amendment. *Jackson v. West*, 787 F.3d 1345, 1352 (11th Cir. 2015) (citation omitted). Regardless, the "minimum standard for providing medical care to a pre-trial detainee under the Fourteenth Amendment is the same as the minimum standard required by the Eighth Amendment for a convicted prisoner[.]" *Andujar v. Rodriguez*, 486 F.3d 1199, 1203 n.3 (11th Cir. 2007) (quotation marks and citation omitted).   Thus, the undersigned will refer to the Eighth Amendment when analyzing Highfield's claims.

of decency or involve the unnecessary and wanton infliction of pain to be actionable under § 1983.

*See Bass v. Sullivan*, 550 F.2d 229, 230 (5th Cir. 1977).[11]

Deliberate indifference can be shown in a variety of ways.  As the Eleventh Circuit Court

of Appeals noted:

> Our cases have consistently held that knowledge of the need for medical care and an intentional refusal to provide that care constitutes deliberate indifference. Medical treatment that is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness" constitutes deliberate indifference.  "A doctor's decision to take an easier and less efficacious course of treatment" also constitutes deliberate [indifference].  Additionally, when the need for medical treatment is obvious, medical care that is so cursory as to amount to no treatment at all may constitute deliberate indifference.

*Adams v. Poag*, 61 F.3d 1537, 1543–44 (11th Cir. 1995) (citations omitted).

When a deliberate indifference claim turns on the quality of the treatment provided, there

is no constitutional deprivation if the medical care provided to the inmate is "minimally adequate."

*Blanchard v. White Cty. Det. Ctr. Staff*, 262 F. App'x 959, 964 (11th Cir. 2008) (quoting *Harris*

*v. Thigpen*, 941 F.2d 1495, 1504 (11th Cir. 1991)).  Deliberate indifference is not established where

an inmate received care but desired different modes of treatment.  *Hamm v. DeKalb Cty.*, 774 F.2d

1567, 1575 (11th Cir. 1985).  Neither will a mere difference of opinion between an inmate and the

institution's medical staff as to treatment and diagnosis alone give rise to a cause of action under

the Eighth Amendment.  *See Smart v. Villar*, 547 F.2d 112, 114 (10th Cir. 1976); *see also Estelle*,

429 U.S. at 107–08.

Moreover, mere negligence in diagnosing or treating a medical condition is insufficient to

support a constitutional claim.  *See Adams*, 61 F.3d at 1543.  Similarly, an accidental or inadvertent

---

[11]  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

failure to provide medical care does not constitute a wrong under the Eighth Amendment.  *See Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) (citing *Estelle*, 429 U.S. at 105–06).  Additionally, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner."  *Estelle*, 429 U.S. at 106.

An official also acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening or urgent medical condition that would be exacerbated by delay.  *See Hill v. DeKalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994), *overruled on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002); *see also Harris v. Coweta Cty.*, 21 F.3d 388, 393–94 (11th Cir. 1994).  When a deliberate indifference claim turns on a delay in treatment, courts must consider "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay."  *Goebert v. Lee Cty.*, 510 F.3d at 1327.   Delay in access to medical treatment can violate the Eighth Amendment when it is "tantamount to unnecessary and wanton infliction of pain."  *Brown v. Hughes*, 894 F.2d 1533, 1537–38 (11th Cir. 1990) (citations and internal quotation marks omitted).  An inmate claiming an unconstitutional delay in medical treatment "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed."  *Hill*, 40 F.3d at 1188, *overruled on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002).

### A.  Qualified Immunity

The defendants assert the defense of qualified immunity with respect to Highfield's claims against them in their individual capacities.  (Doc. 39 at 3; Doc. 42 at 9–11; Doc. 49 at 3).  Qualified immunity protects government actors performing discretionary functions from being sued in their individual capacities.  *See Wilson v. Layne*, 526 U.S. 603, 609 (1999).  The doctrine of qualified

immunity shields government officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity does not shield a government official if he "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [the plaintiff]." *Id.* at 815 (quotation marks, citation, and emphasis omitted).

Courts generally analyze qualified immunity in two steps, although it is unnecessary to evaluate the steps in order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (finding that courts were no longer bound to follow the sequence of the two-part qualified immunity inquiry required by *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001)). First, courts address whether the facts alleged, viewed in the light most favorable to the plaintiff, establish a constitutional violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (receded from on other grounds by *Pearson*, 555 U.S. at 236). If no constitutional violation is established, then the defendant prevails, and "there is no necessity for further inquiries concerning qualified immunity." *Id.* But if a constitutional right would have been established under the plaintiff's version of the facts, then the court must determine whether that right was clearly established. *Id.*

There is no dispute that the defendants were acting within their discretionary authority when the facts alleged in the amended complaint occurred. "When a court concludes [an official] was engaged in a discretionary function, 'the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity.'" *Hill v. Cundiff*, 797 F.3d 948, 978 (11th Cir. 2015) (citation, quotation marks, and emphasis omitted). As explained below, Highfield fails to establish the defendants violated his constitutional rights, which precludes the need to further

address the defendants' qualified immunity defense.[12]  *Ross v. Clayton Cty.*, 173 F.3d 1305, 1310 (11th Cir. 1999) ("The fact that [the plaintiff's] constitutional . . . rights were not violated . . . obviates the qualified immunity issue. . . ."); *Lakoskey v. Floro*, No. 19-12401, 2021 WL 5860460, at *3 (11th Cir. Dec. 10, 2021) (noting that if the plaintiff's constitutional rights were not violated the court need not decide the qualified immunity issue); *Robinson v. City of Huntsville*, No. 5:21-cv-00704-AKK, 2021 WL 4820652, at *5 n.6 (N.D. Ala. Oct. 15, 2021) ("Since there is no constitutional violation, the court need not address the parties' arguments about qualified immunity.").

## B.  Gurley & Screws

The substance of Highfield's amended complaint is that Dr. Gurley prescribed a Qvar inhaler for his COPD that Highfield contends was not as effective as the Advair and Incruse inhalers prescribed to him by his personal physician prior to his incarceration.  (Doc. 13 at 7, Highfield Aff.; Doc. 52 at 1–2).  Viewing the facts in a light most favorable Highfield, his COPD constituted a serious medical need.  However, the evidence does not establish that Gurley and Screws were deliberately indifferent to that need.

Highfield's medical records do not include his medical care for February 2018, when he claims his symptoms began (doc. 13 at 8, Highfield Aff.), but Highfield acknowledges that he was being treated and prescribed medications, although it was not the treatment he wanted.  (Doc. 13 at 4, 7, Highfield Aff.; Doc. 13 at 13).  That Highfield disagreed with the efficacy of the treatment Gurley recommended or simply preferred a different course of treatment does not state a constitutional claim.  Indeed, "a simple difference in medical opinion between the prison's medical

---

[12] Because Highfield brings his claims against the defendants in their individual capacities (doc. 12 at 2–3), it is unnecessary to address whether the defendants are entitled to sovereign immunity in their official capacities.

staff and the inmate as to the latter's diagnosis and course of treatment [does not] support a claim of cruel and unusual punishment." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991).

Similarly, the fact that Highfield's personal physician prescribed him certain COPD medications prior to his incarceration does not establish that Gurley was deliberately indifferent by prescribing Highfield a different COPD medication since a difference in professional opinion between doctors does not rise to the level of constitutional scrutiny. In *Bismark v. Fisher*, 213 F. App'x 892, 896–97 (11th Cir. 2007), the Eleventh Circuit found that a prisoner could not establish that a prison physician was deliberately indifferent for failing to adopt an outside specialist's plan of care. The Eleventh Circuit's explained:

> [I]t is well established that "a simple difference in medical opinion" does not constitute deliberate indifference. Far from interfering with treatment once prescribed, Dr. Fisher was a physician who personally prescribed treatment for Bismark, albeit not that requested by Bismark. The Eighth Amendment did not compel Dr. Fisher to check his own medical training and judgment at the door, simply because he was informed that some other doctor at some other time had prescribed [a different course of treatment] for his patient.

*Id*. at 897 (citation omitted); *see White v. Napoleon*, 897 F.2d 103, 110 (3rd Cir. 1990) (explaining that similar to an inmate's disagreement with a doctor's professional judgment, no claim is stated when a doctor disagrees with the professional judgment of another doctor since there may be several acceptable ways to treat a medical condition). Therefore, Highfield has not demonstrated that Gurley was deliberately indifferent to his serious medical need by prescribing him a Qvar inhaler instead of the Advair and Incruse inhalers his outside physician prescribed.

Highfield also complains that when an unnamed nurse allowed his medications to run out on three occasions for as long as two weeks, he informed Screws, but "was left to suffer" until he

received the medications.[13]  (Doc. 13 at 7–8, Highfield Aff.).  As an initial matter, Highfield does not claim to have any personal knowledge that Screws did not take action to correct the unnamed nurse's error.  At most, he alleges a claim of negligence against medical staff, which does not state a constitutional claim.  The Eleventh Circuit has emphasized that "the deliberate indifference standard . . . is far more onerous than normal tort-based standards of conduct sounding in negligence."  *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1271 (11th Cir. 2020) (quotation marks and citations omitted); *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (noting that accidental inadequacy, negligence, and medical malpractice do not rise to the level of an Eighth Amendment violation).

Furthermore, Highfield contends that on one occasion, this two-week interruption in treatment caused his lungs to hurt and he began coughing up yellowish mucus.  (Doc. 13 at 8, Highfield Aff.).  But Highfield concedes that Screws examined him and determined that his oxygen level was within normal limits.  (Doc. 13 at 8, Highfield Aff.).

Highfield asserts that in May 2018, his "lack of air" forced him to cut himself with a razor so he could obtain treatment at a hospital.  (Doc. 13 at 8, Highfield Aff.).  There, he claims a physician informed him that x-rays revealed he had a "bad case of this C.O.P.D. condition" that had progressed because he had not been "properly treated with the medications that were originally prescribed to [him]."  (Doc. 13 at 8–9, Highfield Aff.).

To the extent Highfield contends there was a delay in adequately treating his condition (doc. 13 at 4), either by the unknown nurse who failed on one occasion to administer his medications or by Gurley administering him Qvar instead of Advair and Incruse, his claim fails.

---

[13] Highfield does not provide the dates the unknown nurse failed to provide him the medications. (Doc. 13 at 7–8).

Highfield has not produced any evidence of the hospital physician's alleged findings that his COPD condition had progressed because he was not using the medications his personal physician prescribed.  Moreover, an x-ray taken during his hospital visit showed his lungs were clear with no mass, consolidation, pneumothorax, or pleural effusion and there were no acute chest findings. (Doc. 39-3 at 25).  Therefore, Highfield has not placed any "verifying medical evidence in the record to establish the detrimental effect" of any delay to succeed on a deliberate indifference claim based on delay.  *Hill*, 40 F.3d at 1188, *abrogated on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002).

Highfield alleges that Gurley's failure to prescribe him Advair and Incruse caused him to suffer until about August or September 2018.[14]  (Doc. 13 at 8, Highfield Aff.). The medical record is devoid of evidence that Gurley and Screws had subjective knowledge of, and disregarded, a risk of serious harm to Highfield due to his COPD.  To the contrary, the record establishes that Gurley and Screws examined Highfield routinely, treated him, and referred him for other diagnostic procedures.  The record does not support a finding that Gurley and Screws refused to treat Highfield or that they were otherwise deliberately indifferent to his medical condition.  Also absent from the record is evidence that the treatment they provided Highfield was "so grossly incompetent, inadequate, or excessive as to shock the conscience." *Adams*, 61 F.3d at 1544, 1545 (holding that whether governmental actors "should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment") (quoting *Estelle*, 429 U.S. at 107) (finding that a medical decision not to order an x-ray, or like measures,

---

[14] It is unclear to the undersigned what changed that Highfield's alleged complications ceased in August or September 2018 since Highfield was still incarcerated at the Cleburne County Jail and Gurley was still prescribing him Qvar.  (Doc. 39-2 at 11, 12, 14).

does not represent cruel and unusual punishment).  Rather, the evidence indicates Gurley and Screws provided Highfield with "minimally adequate" care for his condition.  *Blanchard*, 262 F. App'x at 964 (quoting *Harris v. Thigpen*, 941 F.2d at 1504).  Accordingly, Gurley's and Screws' motions for summary judgment are due to be granted and Highfield's claims against them warrant dismissal.

### C.  Green & Kilgore

The record is also devoid of evidence that Green and Kilgore were deliberately indifferent to Highfield's serious medical need.  Highfield does not deny that Green and/or Kilgore forwarded his letters about medical care to jail medical staff.  (Doc. 43-1, Green Decl. ¶ 9; Doc. 43-2, Kilgore Decl. ¶ 10).  Neither does Highfield dispute Kilgore's assertion that he watched Gurley and Screws treat Highfield on one occasion and did not observe anything that would make him believe medical staff was treating Highfield in an unsatisfactory manner.  (Doc. 43-2, Kilgore Decl. ¶¶ 10, 16).

Green and Kilgore assert that they relied on medical staff to make the best medical determinations concerning inmates' health.  (Doc. 43-1, Green Decl. ¶ 21; Doc. 43-2, Kilgore Decl. ¶ 23).  Green and Kilgore's respective positions did not require them to micromanage the actions of medical staff.  Rather, "supervisory officials are entitled to rely on medical judgments by medical professionals responsible for prisoner care," *Williams v. Limestone County, Ala.*, 198 F. App'x 893, 897 (11th Cir. 2006), and they have no duty to directly supervise medical personnel or to intervene in treatment decisions where they have no actual knowledge that intervention is necessary to prevent a constitutional deprivation. *See Spruill v. Gillis*, 372 F.3d 218, 236 (3rd Cir. 2004) (finding that in the absence of a reason to believe, or actual knowledge, that medical staff is administering inadequate medical care, non-medical prison personnel are not chargeable with the Eighth Amendment scienter requirement of deliberate indifference); *Clark v. Sheffield*, 807 F.

App'x 910, 917 (11th Cir. 2020) (holding that neither the sheriff nor the jail administrator were trained medical professionals and had no role in the inmate's examinations or course or treatment); *Cameron v. Allen*, 525 F. Supp. 2d 1302, 1307 (M.D. Ala. 2007) ("The law does not impose upon [jailers] a duty to directly supervise health personnel, to set treatment policy for the medical staff or to intervene in treatment decisions where they have no actual knowledge that intervention is necessary to prevent a constitutional wrong.").

Highfield further alleges that Green failed to provide funds to cover the cost of his medications. (Doc. 13 at 9, Highfield Aff.). But Highfield does not allege he has personal knowledge that Green refused to provide money for his medications and fails to point to evidence of the same.[15] Instead, Highfield merely relies on his conclusory statement that Green refused to pay for his medications which is inadequate to defeat summary judgment. *See Ellis v. England*, 432 F.3d 1321, 1327 (11th Cir. 2005) (noting that "mere conclusions and unsupported factual allegations, as well as affidavits based, in part, upon information and belief, rather than personal knowledge, are insufficient to withstand a motion for summary judgment").

Based on the foregoing, Highfield has not established that Green and Kilgore were deliberately indifferent to his serious medical need in violation of the Eighth Amendment. Accordingly, Green and Kilgore's motion for summary judgment is due to be granted.

## V. RECOMMENDATION

For the reasons stated above, the undersigned **RECOMMENDS** the court **GRANT** the motions for summary judgment and **DISMISS** this action **WITH PREJUDICE**.

---

[15] While Highfield contends Gurley informed him that his previously prescribed medications were too expensive, and Gurley could only prescribe him what Gurley could get through FEMA, Highfield does not allege that Gurley attributed his inability to obtain the medications to Green's failure to provide funds. (Doc. 13 at 7, Highfield Aff.).

## VI. NOTICE OF RIGHT TO OBJECT

Any party may file specific written objections to this report and recommendation. A party must file any objections with the Clerk of Court within 14 calendar days from the date the report and recommendation is entered. Objections should specifically identify all findings of fact and recommendations to which objection is made and the specific basis for objecting. Objections also should specifically identify all claims contained in the complaint that the report and recommendation fails to address. Objections should not contain new allegations, present additional evidence, or repeat legal arguments. An objecting party must serve a copy of its objections on each other party to this action.

Failing to object to factual and legal conclusions contained in the magistrate judge's findings or recommendations waives the right to challenge on appeal those same conclusions adopted in the district court's order. In the absence of a proper objection, however, the court may review on appeal for plain error the unobjected to factual and legal conclusions if necessary in the interests of justice. 11th Cir. R. 3-1.

On receipt of objections, a United States District Judge will review *de novo* those portions of the report and recommendation to which specific objection is made and may accept, reject, or modify in whole or in part, the undersigned's findings of fact and recommendations. The district judge must conduct a hearing if required by law. Otherwise, the district judge may exercise discretion to conduct a hearing or otherwise receive additional evidence. Alternately, the district judge may consider the record developed before the magistrate judge, making an independent determination on the basis of that record. The district judge also may refer this action back to the undersigned with instructions for further proceedings.

A party may not appeal the magistrate judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit.  A party may only appeal from a final judgment entered by a district judge.

DONE this 14th day of January, 2022.

**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE